Filed 2/27/26  P. v. Pipping CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084806 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI23002660) |
| BRIAN FREDERICK PIPPING, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, John P. Vander Feer, Judge.  Affirmed.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Arlene A. Sevidal, Supervising Deputy Attorney and Randall D. Einhorn, Deputy Attorney General for Plaintiff and Respondent.

A jury convicted Brian Frederick Pipping of second degree murder (Pen. Code, § 187, subd. (a)) and possession of a firearm by a convicted felon (Pen. Code, § 29800, subd. (a)).  It found true allegations with respect to the murder that Pipping personally discharged a firearm proximately causing death (Pen. Code, § 12022.53, subds. (c), (d)).  In a bifurcated proceeding, the court found true allegations that Pipping had a prior strike conviction (Pen. Code, § 667, subds. (b)-(i)) and a prior serious felony conviction (Pen. Code, § 667, subd. (a)(1)).  It sentenced Pipping to a 60-year-to-life prison term: 30 years to life (15 years to life, doubled) for the murder, a consecutive term of 25 years to life for the firearm enhancement, and five years for the serious felony prior conviction.  The court imposed a concurrent upper term of six years (three years, doubled) for the firearm charge.

Pipping contends his counsel was constitutionally ineffective for failing to object and seek an admonishment to what he asserts was the prosecutor's misconduct in closing arguments—remarks that he claims lessened the prosecution's burden of proof similar to those requiring reversal in *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*).  He argues that because the case was close, his counsel's failing was not harmless, requiring reversal of his convictions.  We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

In August 2023, Y.R. drove a friend to the desert, arriving at a dark area on a dirt road surrounded by trailers.  While there, Y.R. heard what she thought were three firecrackers or gunshots, and someone yell either "No, no, no," or "Go, go, go."  Scared, Y.R. began to drive away but felt a thump in the back of the truck she was driving.  Y.R.'s friend looked back and saw somebody in the back of the truck.  She tried to tell him to get up, but he was

2

unresponsive. As Y.R. drove off, she saw headlights in her rear-view mirror and heard a loud vehicle. Based on the man's condition, Y.R. drove to the hospital. Y.R. has non-Hodgkins lymphoma. For that condition, she took pain medicine daily and wore a Fentanyl patch, which affected her ability to recall what happened.

R.M. was in the same area that night. After she heard gunshots, she saw a loud compact vehicle chasing a truck. R.M. called police.

Early in the morning on August 3, 2023, police officers responded to a call about a gunshot wound victim at the Barstow Community Hospital. They spoke with the victim, Shaun Milazo, who told them that "Red" shot him. Milazo was known by some as "Freak." Milazo later died from complications from the gunshot wounds.

In June 2023, D.H. lived with his girlfriend K.W., as well as Pipping and Pipping's girlfriend, S.D. Pipping went by the nickname "Red." D.H. saw in that time frame that Pipping had two nine-millimeter pistols. Around July or August 2023, D.H. heard Pipping talk a lot about Freak and doing him harm. Pipping admitted to D.H. that he shot Freak in the stomach three or four times. Pipping told D.H. that he put his hand over his car door and shot. Pipping also told D.H. that he thought Freak had snitched on him in regard to a case Pipping was involved in. Pipping told D.H. that before the shooting, Milazo said, "Please don't shoot me. Please don't kill me." Pipping drove a dark Scion that had a loud exhaust.

On the morning of the shooting, D.H. was in Arizona. He called K.W. that morning and heard Pipping tell her to say he was home all night. After the shooting, D.H. heard Pipping say he was going to give the Scion away. He also saw S.D. hold up a nine-millimeter gun from a red tool bag and say that she was going to get rid of it. D.H. never saw the gun again. D.H.

3

testified he had been a daily methamphetamine user at the time of the incidents, but considered himself a functioning addict so his drug use did not impact how he remembered events.

In July 2023, K.W. also heard Pipping talk about Freak. Pipping stated that someone had stolen a truck from his friend L.F., and he was going to do something about it. Pipping mentioned Freak daily, getting angrier each day, and said he was going to "put him on ice" and "get him." To K.W., that meant "[s]omething lethal." K.W. recalled that among other vehicles, Pipping owned a two-door matte black Scion that was loud and a black F-450 pickup truck. K.W. testified that in the early morning hours of August 3, 2023, Pipping banged on her bedroom door and loudly said, "wake up 911 emergency" and, "If the cops come, I've been here all night." Later, K.W. asked Pipping what had happened, and he bragged, "We got him, we shot Freak." K.W. looked up Milazo on social media to see if he survived the shooting, and Pipping confirmed that Milazo was Freak.

Within a day or two after August 3, 2023, a police vehicle came by K.W.'s house, and Pipping "freaked out." Pipping told K.W. to put on his jacket and hat and go out front so they would think she was him. K.W. heard Pipping say he was going to get rid of his Scion; that "[i]t needed to be gone." She later saw him clean out the inside of the car. Days later she was bringing Pipping and his friend L.F. something to drink and she heard Pipping say that he shot Freak four times. K.W. testified that Pipping was never without a gun; on one occasion after the shooting she heard a gunshot from Pipping's bedroom and thought he had killed himself. When she went to look, she found him sitting up with a look of exasperation. K.W. surmised that because Pipping was "running, running, running" and not sleeping, he

4

had fallen asleep with his black handgun and it fired through the roof of the house when his hand fell on it.

Pipping was arrested on August 18, 2023. After his arrest, K.W. was not entirely forthcoming with police out of fear, but once she learned Milazo had died, K.W. reached out and told them everything she knew. Three or four days after Pipping's arrest, K.W. saw S.D. with two black handguns in a tool bag. S.D. said she was going to get rid of them and left the house. At one point, Pipping called K.W. from jail and claimed everyone was lying, telling her, "I might use you as a character witness because I was home all night and you know it, you know what I mean?" and "I'm gonna use you if need be. I'm gonna use you as my witness that I was home all night." Though K.W. had used marijuana and methamphetamine in the past, she was not under the influence during the incidents with Pipping that she recounted at trial.

*Defense Evidence*

At trial, Pipping denied shooting Milazo, though he admitted he was at the location where the shooting occurred. He denied telling the other witnesses that he had shot Milazo or was going to put him "on ice." Pipping testified that he was on good terms with Milazo, and they were friends. He believed Milazo had stolen a black pickup truck from L.F. but Milazo offered the truck to him, and Pipping wanted it, so he bartered a deal for it from some third parties who had purchased it from Milazo.

Pipping testified that on the morning of Milazo's shooting, Milazo had called Pipping, so Pipping drove his Scion out to a wrecking yard to meet with him. Pipping admitted his Scion had a loud exhaust. Milazo, who was in the truck with Y.R., came up to his car and was leaning in to talk, then Milazo said he saw a person with a gun. Pipping testified he saw another person, J.R., pointing a gun then firing three times. Y.R.'s truck fishtailed

5

and drove away. Pipping followed Y.R.'s truck out of the wrecking yard and drove away in another direction. Pipping testified he went home without calling police because he was afraid for his life.

At trial, when asked about a jail call he had made to S.D. about a location next to the house, he testified that he was referring to a Milwaukee bag where he kept his money. He stated on cross-examination that he kept $6,800 in the bag, which was buried on the property where he lived with the others.

*Closing Arguments*

The prosecutor began her arguments by stating: "On August 3rd, 2023, the defendant shot and killed Shaun Milazo. The evidence proves this. The testimony proves this. Logic and reason prove this. The defendant's actions prove this. All of that combined, prove that . . . Pipping committed first-degree murder, and his victim was . . . Milazo." She discussed the degrees of murder and intent, summarized the evidence of Pipping's planning, and went over the gun allegations and the felon-in-possession charge. She then turned to the evidence from the witnesses: "I want to talk a little bit about [K.W.] and [D.H.] and what they said. And there is a CALCRIM instruction about witness credibility, and what you can use to evaluate the veracity and honesty of their testimony. [¶] Now, I want to point to two in particular. Did other evidence prove or disprove anything about what [K.W.] or [D.H.] testified? And, secondly, how reasonable is their testimony when you consider all the other evidence in the case?"

The prosecutor summarized some of K.W.'s testimony and explained how other evidence "proved what [K.W.] was testifying about." The prosecutor said: "How reasonable is [K.W.'s] testimony when you consider all the evidence in the case? It's reasonable to think [Pipping] shot . . . Milazo,

6

put the guns in the Milwaukee bag in his backyard, and then once he's in custody, he tells his girlfriend of three years, a person who is very devoted to him, to go out to this place, dig up the guns about a foot down, and get rid of them for me. [¶] And that's reasonable given what [K.W.] and [D.H.] saw. [¶] And that's reasonable given what you heard [Pipping] tell [S.D.] himself on August 25th and 26th. That proves what [K.W.] and [D.H.] was talking to you about. What they testified about."

The prosecutor referenced K.W.'s testimony that Pipping banged on her door the morning of the shooting and told her to tell police he had been at the house all night. She pointed out K.W.'s testimony was corroborated by the jail call in which Pipping told her he would use her as a "character witness, because I was home all night. . . . You know what I mean?" She recounted that a law enforcement witness testified that they located a bullet hole in the roof of Pipping's bedroom, again corroborating K.W.'s testimony and proving "her veracity, . . . her honesty." The prosecutor said: "And how reasonable is that testimony? It makes sense. It's reasonable [Pipping] came home after committing a murder, and he says, no, I need somebody to say I was here all night, because I wasn't. And so who do I get? I get my roommate. I bang on her door and tell her what to say. And just to make sure, once I'm in custody, I'm going to call her and I'm going to repeat that again. Okay. I'm going to use you as my witness. Tell the police I was here all night." The prosecutor made the same type of arguments with respect to D.H.

The prosecutor then turned to Pipping's testimony, saying, "Let's apply that same analysis now to what [Pipping] testified to." She recounted that he testified that another man, J.R., shot Milazo, but pointed out no other witness mentioned such a person: "[Pipping] himself said it on the stand yesterday. The first time he ever said it. First time he ever told anyone

7

about this alleged [J.R.] coming out of nowhere at the murder scene and shooting [Milazo]. That disproves what he's saying." She continued: "When—when asked about the bag, or what he was talking about with [S.D.] on the jail call, about this thing by the tree that's about a foot down that she needs to get and no one else can get. He says it was a bag that had $6,000 [*sic*] in it. No guns. $6,000. How reasonable is that testimony? How reasonable is that? Who has $6,000 sitting in a bag that's buried in the back yard that he shares with five other adults?"

"And, again, when I asked him yesterday, Why didn't you say it was money? And he says, I didn't trust [S.D.]. He's also speaking on speaker phone. I did [*sic*] want D.H., I didn't want [K.W.], who just happens to be the very people testifying against him. I didn't want them getting that money.

"Okay. But didn't you just give them the location anyway, if they're listening in? He didn't have an answer to that. So how reasonable is that? Are you going to [be] shy about $6,000 in a red Milwaukee bag, after committing a murder? Or are you going to be shy about guns? Afraid they're going be found? Are you going to be reaching out to your girlfriend to get rid of that? And when you consider what [K.W.] and [D.H.] saw, that's not reasonable."

The prosecutor pointed out that Pipping claimed his car had been stolen on August 3, 2023, but that the evidence showed he gave the car away, and also that telephone calls contradicted his claim that Milazo called him to meet up the night of August 3, thus "this evidence disproved what [Pipping] testified about."

She argued it was not reasonable that Pipping claimed Milazo was like a brother and yet Pipping never called him, messaged him or visited him in the hospital: "We all saw the last message that [Pipping] sent to [Milazo].

8

And it wasn't, 'How are you?' It wasn't, 'What hospital are you at?' He claims he had the presence of mind, he knew something bad had happened because he claims he asked [K.W.] to Google hospital records to find the victim. But he never once says, 'Where are you? Are you okay?' He never once finds out where he is. He never goes to the hospital. He never calls."

"When we're talking about how reasonable is that testimony, right? If we are going to talk about someone, you say he's your brother, he's your friend, is this someone you're never going to shoot? Is this someone you're never going to harm? Is it reasonable to send nothing? It's not. It's not reasonable to not check up on this person. It's not reasonable to never call this person, to never try to find out how this person is. It's not reasonable to send a text or message about your car, after you saw this dear friend of yours, this brother of yours, gets shot.

"When I asked him, 'Why? Why didn't you?' Because there is not any messages ever after August 3rd between [Pipping] and the victim. He says, 'Oh, well the Internet went out, and I couldn't reply until then,' a day and a half later. He had a day and a half to think about it, and he still says this, 'Someone stole my car. I woke up and it was gone.' Not, 'I saw you get shot. Are you okay? What hospital are you at? I'm going to come visit you. You're my brother.'

"Not only does the evidence disprove what he's saying, it's just not reasonable when you consider everything else that's been shown to you in this case."

The prosecutor argued that Pipping's testimony was not the truth; that everyone agreed he was at the scene, driving a loud vehicle, and that he was the shooter. She said, "At the beginning of closing argument, I said that

logic, reason, testimony, evidence, it all proves that [Pipping] is the killer. But the defendant himself, through his actions shows you he was the killer."

## DISCUSSION

### I. *Legal Principles*

### A. *Prosecutorial Misconduct*

"Wrongful conduct by a prosecutor ' "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] Prosecutorial misbehavior that falls short of this threshold violates state law when ' "it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citation.] In addressing claims of misconduct involving statements made at closing argument, we have recognized that ' "it is improper for the prosecutor to misstate the law." ' [Citation.] Otherwise, however, ' " '[a] prosecutor is given wide latitude during argument . . . .' " ' " (*People v. Aguirre* (2025) 18 Cal.5th 629, 706-707.)

" ' "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275; see also *People v. Henderson* (2020) 46 Cal.App.5th 533, 548.)

B. *Ineffective Assistance of Counsel*

"'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.'" (*People v. Aguirre*, *supra*, 18 Cal.5th at p. 706.)  On such claims, "[t]he appellate record . . . rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored."  (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

An ineffective assistance of counsel claim "requires a showing of both deficient representation and resulting prejudice.  [Citation.]  To establish prejudice, a defendant claiming ineffective assistance of counsel 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Aguirre*, *supra*, 18 Cal.5th at p. 706.)  "'"'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"'" (*People v. Rices* (2017) 4 Cal.5th 49, 80; see *Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Henderson*, *supra*, 46 Cal.App.5th at p. 549.)

"'"[A]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel."'" (*People v. Gurule* (2002) 28 Cal.4th 557, 609-610.)  In particular, the failure to object to a prosecutor's argument "'"seldom establishes counsel's incompetence."'" (*People v. Aguirre*, *supra*, 18 Cal.5th at p. 707.)  *Aguirre* explains: "'Representation does not become deficient for failing to make meritless objections' [citation] and there may be valid reasons why counsel may choose not to make even a meritorious objection [citations].  As one court has

11

explained, 'From a strategic perspective, . . . many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality.' [Citation.] Other tactical reasons to refrain from raising even valid claims of error in the presentation of argument can include the interest in not drawing additional attention to, or inviting elaboration on, comments made by opposing counsel . . . . This all said, error in the presentation of argument may be so apparent and impactful absent corrective measures as to render a failure to object ineffective assistance." (*Id*. at p. 707.)

C. *Centeno*

Because Pipping likens the prosecutor's closing arguments to those in *Centeno*, we discuss that case in depth.

In *Centeno*, defendant challenged convictions for child molestation, claiming prejudicial error stemming from the prosecutor's closing argument in rebuttal, to which his counsel did not object. (*Centeno, supra*, 60 Cal.4th at pp. 664, 674.) In her rebuttal, the prosecutor used an outline of the state of California and a hypothetical that in a criminal trial, the issue was what state was shown. (*Centeno,* at p. 665.) She asked the jury to suppose various witnesses gave accurate, incomplete, wrong, and missing information on the question. (*Id*. at p. 665.) She argued: " '[I]s there a reasonable doubt that this is California? No. You can have missing evidence, you can have questions, you can have inaccurate information and still reach a decision beyond a reasonable doubt. What you are looking at when you are looking at reasonable doubt is you are looking at a world of possibilities. There is the impossible, which you must reject, the impossible [*sic*] but unreasonable, which you must also reject, and the reasonable possibilities, and your

12

decision has to be in the middle.  It has to be based on reason.  It has to be a reasonable account.  And make no mistake about it, we talked about this in jury selection, you need to look at the entire picture, not one piece of evidence, not one witness.  You don't want to look at the tree and ignore the forest.  You look at the entire picture to determine if the case has been proven beyond a reasonable doubt.' " (*Id*. at pp. 665-666.)  The prosecutor then turned to the trial evidence, and asked the jury if it was reasonable to believe the victim was lying, or that there was an innocent explanation for the defendant's conduct.  (*Id*. at p. 666.)

*Centeno* disapproved of the use of this type of visual aid, in which the outline was "presented as a given" (*Centeno, supra,* 60 Cal.4th at p. 670), that is, presumed to be the outline of a state:  "The use of an iconic image like the shape of California or the Statue of Liberty, unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt.  These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial.  They are immediately recognizable and irrefutable.  Additionally, such demonstrations trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion." (*Centeno, supra,* 60 Cal.4th at p. 669.)  "[T]he most important part of [the prosecutor's] hypothetical, the visual aid showing the shape of California, was not supported by evidence admitted during the imaginary trial and was also irrefutable.  [¶]  Additionally, the hypothetical was misleading because it failed to accurately reflect the evidence *in this case*, which was far from definitive." (*Id*. at p. 670.)  The court concluded, "The prosecutor . . . left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met

their burden.  The failure of the prosecutor's reasoning is manifest." (*Centeno, supra*, 60 Cal.4th at p. 672.)

In reaching this conclusion, *Centeno* made clear that not all of the prosecutor's arguments were objectionable:  "It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory.  [Citation.]  It is permissible to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts.  [Citation.]  It is certainly proper to urge that the jury consider all the evidence before it." (*Centeno*, *supra*, 60 Cal.4th at p. 672.)  The "argument that the jury must ' "decide what is reasonable to believe versus unreasonable to believe" and to "accept the reasonable and reject the unreasonable[ ]" ' . . . '[does not] lessen[ ] the prosecution's burden of proof.  The prosecution must prove the case beyond a reasonable doubt, not beyond an unreasonable doubt.' [Citation.]  [¶]  Conversely, it is error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof.*" (*Ibid.*)

*Centeno* explained that the prosecutor in that case "did not simply urge the jury to ' "accept the reasonable and reject the unreasonable" ' in evaluating the evidence before it.  [Citation.]  Rather, she confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt.  She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence.  These remarks clearly diluted the People's burden." (*Centeno, supra*, 60 Cal.4th at p. 673.)

Thus, the court held defense counsel's failure to object was ineffective assistance, and the error prejudicial given that the case was very close,

14

involving "starkly conflicting evidence and required assessments of witness credibility." (*Centeno, supra*, 60 Cal.4th at pp. 663, 670, 674-677.)

## II. *Analysis*

Pipping argues the prosecutor's arguments in closing and rebuttal are the same as those found improper in *Centeno*, pointing to the prosecutor's arguments as to the reasonableness of Pipping's testimony compared to that of K.W. He characterizes the prosecutor as making repeated arguments suggesting the prosecution's case was reasonable, thereby lightening the burden of proof "by taking the focus off the question of guilt beyond a reasonable doubt and instead placing it on whether appellant's story was more believable." According to Pipping, the prosecutor " 'strongly implied that the People's burden was met if its theory was "reasonable" in light of the facts supporting it.' " He argues: "When the prosecutor urges the jury to find a defendant guilty by arguing the defendant's version of an event as unreasonable *in contrast* with the prosecutor's version based on facts favorable to the prosecution, it undermines the burden of proof."

## A. *The Prosecutor Did Not Engage in Misconduct, So Counsel Was Not Ineffective for Failing to Object*

We reject Pipping's claim of prosecutorial misconduct in closing arguments. We ask whether Pipping has shown, " '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno, supra*, 60 Cal.4th at p. 667; *People v. Henderson, supra*, 46 Cal.App.5th at p. 548.)

15

Here, the prosecutor did not engage in the same conduct found to be error in *Centeno*. She did not use an improper visual aid with a presumptive hypothetical that "risked misleading the jury by oversimplifying and trivializing the deliberative process." (*Centeno, supra*, 60 Cal.4th at p. 671.) None of her remarks, at least initially, mentioned the reasonable doubt standard, much less "confounded the concept of rejecting unreasonable inferences with the standard of proof beyond a reasonable doubt." (*Id*. at p. 673.) She did not " '[e]xplain[ ]' the reasonable doubt standard by using an iconic image unrelated to the evidence," which is "particularly misleading to the jury and strikes at the most fundamental issue in a criminal case." (*Id*. at p. 675.) As *Centeno* characterized the problem: "The prosecutor posited an easy example of proof beyond a reasonable doubt to reassure this jury that it could confidently return guilty verdicts in a case not nearly so strong as her hypothetical. The hypothetical, along with the prosecutor's argument that the jury could convict based on a 'reasonable' account of the evidence, cannot conceivably be viewed as beneficial to the defense." (*Ibid*.)

Rather, the remarks Pipping challenges plainly related to the jury's evaluation of the evidence and what conclusions were reasonable or unreasonable. In context, the prosecutor was addressing the state of the evidence as told by K.W and D.H. as well as other witnesses, and whether Pipping's version of events and claim of another shooter was reasonable given all the other evidence. Viewing the argument as a whole and the prosecutor's discussion of the evidence in the course of making those remarks, we are not persuaded the jury was confused regarding the People's burden of proof or believed Pipping had a burden to prove his own innocence. (Accord, *People v. Huggins* (2006) 38 Cal.4th 175, 207 ["Closing argument in a criminal trial is nothing more than a request, . . . to believe each party's interpretation,

16

proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument, and that is essentially what the prosecutor did here"].) These remarks did not mislead the jury to believe that if they disbelieved Pipping or found his story unreasonable, they must find him guilty irrespective of the prosecutor's burden of proving all of the elements beyond a reasonable doubt. And, Pipping's counsel in his closing argument emphasized at the outset that "the criminal defendant is presumed to be innocent and remains so throughout, unless and only until the prosecution has proved their case beyond a reasonable doubt."

Because the prosecutor's remarks were not improper, it was not ineffective assistance for Pipping's counsel to withhold objections. (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 ["Because there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance"]; *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["Failure to raise a meritless objection is not ineffective assistance of counsel"].) Pipping's counsel is presumed competent (*Strickland v. Washington*, *supra*, 466 U.S. at p. 690), and thus we presume had he interpreted the prosecutor's remarks as lessening or confusing the burden of proof, he would have raised an objection, allowing for any necessary clarification. That he did not object indicates he correctly understood the prosecutor was commenting on the state of evidence and urging the jury to reject as unreasonable Pipping's story that another individual shot Milazo.

B. *Pipping Cannot Establish Prejudice*

Pipping's ineffective assistance claim fails for another independent reason: his inability to establish prejudice. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

17

expect will often be so, that course should be followed." (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241; *People v. Henderson*, *supra*, 46 Cal.App.5th at p. 549.)  "It is not enough to establish prejudice for defendant to propose that counsel's performance had some 'conceivable effect' on the outcome; rather, defendant must show a reasonable probability of a *different* result but for counsel's errors.  [Citation.]  Prejudice must be a demonstrable reality established based on facts in the record, not simply speculation as to the effect of the errors or omissions of counsel."  (*People v. Tilley* (2023) 92 Cal.App.5th 772, 778.)

Pipping argues his counsel's failure to object cannot be harmless because the case was close.  He points to the timing of the jury's deliberations, which lasted six and a half days, as well as its request for read-backs of the testimony of R.M. and her 911 call, Y.R., D.H., K.W., L.F. as well as Pipping and his jail calls.  He argues that the jury's second degree murder verdict indicates it rejected testimony that Pipping said he wanted to "ice" Milazo.

We are not persuaded.  In *Centeno*, the case had "starkly conflicting" evidence and the victim's credibility was not straightforward.  The case was close in that "[t]he crucial evaluation of [the then 10-year-old victim's] testimony involved many factors, including her demeanor at trial, the inconsistencies in her various accounts, her initial denial under oath, her unwillingness to answer numerous questions, the lack of corroborating evidence, defendant's denials, and testimony from [her] father corroborating defendant's account."  (*Centeno, supra*, 60 Cal.4th at p. 670.)  This case involved the victim, Milazo, identifying Pipping as the shooter to police, as well as multiple witnesses recounting Pipping's admissions that he had committed the shooting.  Some courts have inferred a close case based on

18

lengthy deliberations and requests for readback of testimony (see, e.g. *People v. Diaz* (2014) 227 Cal.App.4th 362, 384-385 [readbacks and lengthy deliberations, combined with juror notes indicating that other jurors were unwilling to find the defendant guilty of murder, manifested the closeness of the case]), but we cannot reach that conclusion here.  (Accord, *People v. Walker* (1995) 31 Cal.App.4th 432, 438-439.)  Instead, the jury's lengthy deliberations and requests, as well as its decision to convict Pipping of second degree murder, can "as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Walker*, at p. 439.)

Finally, the trial court instructed the jurors that they "must follow the law as I explain it to you, even if you disagree with it.  [¶]  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

On this record, we cannot conclude that were it not for Pipping's counsel's failure to object to the prosecutor's closing argument remarks, there is a reasonable probability Pipping would have secured a different outcome. (*Strickland, supra,* 466 U.S. at p. 687; *People v. Aguirre, supra,* 18 Cal.5th at p. 706.)  There is no merit to his ineffective assistance claim.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


KELETY, J.

20